Brewer *v.* Marshall and Cheeseman.

*For affirmance*—BEDLE, CLEMENT, VAIL, VREDENBURGH, WALES. 5.

---

NOVEMBER TERM, 1868.

BREWER, appellant, and MARSHALL and CHEESEMAN, respondents.

1. A covenant made by a vendor of real estate, that neither he nor his assigns will sell any marl from off the premises adjoining the tract conveyed, will not be enforced in equity against the alienee of the land intended to be burthened by such covenant.

2. Such a covenant should not be sustained, on the ground that the principle on which alone it could rest would sanction the annexation to the land of any stipulation which human caprice might contrive.

3. Such covenant is also illegal and void as being in general restraint of trade.

4. Equity will enforce covenants connected with land in the hands of alienees, in some cases in which there is no legal remedy against such alienees; but such cases should not be unnecessarily multiplied.

The injunction in this case restrains the defendant, Marshall, from selling or removing from the farm conveyed to him by the defendant, Cheeseman, known as the Swope farm, any marl, and from digging any marl on it except for the use of the farm. The defendants have filed their answer, and move to dissolve the injunction.

The defendant, Cheeseman, was, in 1841, seized of a farm in the county of Gloucester, known as the Swope farm, on which there were valuable beds of marl. On the 23d of February, in that year, he conveyed to James W. Lamb two tracts of that farm, one a tract of forty-eight acres, lying east of the Cross Keys road, which divided the farm, and another of twelve and a half acres, lying west of the road, on Great Timber creek, and which, in the deed, is described as "twelve acres and a half of marl land." The deed grants a right of way over a strip twenty feet in width from the road to the creek along the marl lot, and contains, in the description of the premises after the description of the way, these words: "Also the said George Cheeseman, his heirs or assigns, are not to sell any marl, by the rood or quantity, from off his premises adjoining the above property."

On the 14th of December, in the same year, Lamb conveyed back to Cheeseman the forty-eight acre lot. On the 3d of January, 1842, Cheeseman conveyed to Lamb another part of the Swope farm, in two lots. One was a lot of seven acres adjoining the creek, and north of and adjoining the twelve and a half acre lot; the other was a strip of one acre, leading from the seven acre lot eastwardly to the road, and including the land over which the right of way had before been granted.

On the same day Cheeseman executed to Lamb a bond in the penalty of $5000, secured by a mortgage on part of the Swope farm not conveyed. The conditions of the bond and mortgage (which were both in the same words), contained this recital: that Cheeseman, in consideration of $1650, had, by deed of the same date, conveyed to Lamb a lot of seven acres, part of the Swope farm; that the principal value of said lot consisted in the valuable beds of marl upon it; that there were divers like beds of marl upon the residue of the Swope farm; that said sum was paid not only as the consideration for said lot, but upon the express agreement between the parties that neither Cheeseman, his heirs or assigns, nor any other person holding said farm, should, within thirty years from the date, dig, sell, remove, or suffer to be dug, sold, or removed from off the said farm, any part or parcel of the marl thereon, except for the use of the farm, " so that the said marl, or any part thereof, should not be sold or otherwise brought into competition with the marl of the said James W. Lamb;" and upon the further agreement that for any violation of said covenant by the said Cheeseman, his heirs, executors, administrators, or assigns, or other persons holding said farm under him or them, said Cheeseman, his heirs, executors, or administrators, should pay to said Lamb, his heirs, executors, administrators, or assigns, the sum of $500. The condition was, that if they did not so dig or sell, and if they paid up such penalties, the obligation and mortgage should be void.

On the 6th of September, 1842, Lamb conveyed back to Cheeseman the seven acre lot, except a triangular part containing about one-tenth of an acre, retained to give access from the one acre strip (used as a way) to the twelve and a half acre lot, this being the means of communication from that lot to the Cross Keys road. Lamb conveyed the twelve and a half acre lot, the one acre used for a way, and the tenth of an acre reserved from the seven acre lot, to the complainant Brewer, by two deeds, one dated March 3d, 1847, the other dated January 3d, 1848; the last deed conveyed

the one acre used as a road, and the tenth of an acre reserved from the seven acre lot. And on the same day Lamb assigned to Brewer the bond and mortgage given to him by Cheeseman. Cheeseman, by four deeds made at different times, conveyed to the defendant, Marshall, the rest of the Swope farm not conveyed to Brewer.

Both the defendants have at different times dug, removed, and sold from the seven acre tract and other parts of the Swope farm, marl by the ton and measured quantity, since 1842; and the defendant, Marshall, was continuing to do so until the injunction.

These facts appear by the bill and are admitted by the answer.

The opinion of the Chancellor is reported in 3 *C. E. Green*, 338.

*Mr. Browning*, for appellant.

*Mr. J. Wilson*, for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

The facts out of which this controversy has arisen, so fully appear in the statement which prefaces this opinion, that I do not deem it necessary to repeat them *in extenso*. It will answer every present purpose to say, that one George Cheeseman was originally the owner in fee of the several tracts of land now respectively owned by the appellant, Mr. Brewer, and by the respondent, Mr. Marshall; that on the 23d day of February, 1841, he conveyed to the grantor of the appellant, the lands now held by the latter, and also, by the same instrument, another tract of twenty-eight acres, and that in this deed there was a covenant in the following words, viz. "Also, the said George Cheeseman, his heirs or assigns, are not to sell any marl, by the rood or quantity, from off his premises adjoining the above property." The tract described in this covenant as that to which the restriction was to apply, is now owned by the respondent, Mr.

Marshall, who, notwithstanding the covenant just quoted, has exercised, and still claims, the right to sell marl therefrom. Before proceeding to test the strength of this position, it should be premised, that this respondent is not in a situation to deny that, at the time he acquired his rights, he had notice of this covenant. The law conclusively charges him with such information, because the deed which contains this restrictive agreement, constitutes one of the muniments of his own title. The covenant is contained in the conveyance of the forty-eight tract to the grantor of the appellant, and that tract was re-conveyed, by such grantor, to Cheeseman, the original owner, who then conveyed it to the respondent, thus incorporating in the chain of the title of the latter the covenant in question. In this position of things the respondent is chargeable, by incontestable legal presumption, with full knowledge of the existence of the stipulation in question, for the rule upon that subject is settled by a long series of decisions, as will appear from the cases collected in the voluminous notes to the case of *Le Neve* v. *Le Neve*, 2 *Lead. Cas. in Eq.* 182. It is to be assumed, therefore, as an incontrovertible fact, that when the respondent took his conveyance he was aware that his grantor had covenanted, both for himself and his assigns, that no marl should be sold from off the premises so conveyed. This presumption obviously makes the attitude of the respondent an unfair one. He knew that Mr. Cheeseman's vendee, who is now represented by the appellant, had paid his money in purchase of this stipulation and in reliance on its honest performance, and consequently that it was the duty of Mr. Cheeseman, in the fair discharge of his obligation, not to sell this land free as to its uses. But the respondent stands upon his strict legal rights, and insists that the covenant in question is not either of a character to run with the title, nor to create an easement in the land, and that, consequently, he takes such land, as the assignee of the covenantor, unbound by such obligation.

I think the Chancellor, in the opinion which he has sent

up in this case, has clearly shown, that these premises, on which the defence has been rested, are well founded, for I quite agree that the covenant under consideration neither runs with the land, nor is it, in effect, the grant of an easement. But the difficulty with me has been, whether, granting these premises, the conclusion follows that the complainant is not entitled to relief in this court. The point is this : there is a class of cases in which equity will charge the conscience of an alienee of land with an agreement relating to such land, where clearly the agreement neither creates an easement nor runs with the title. This rule has been too frequently acted upon and is too deeply seated in our legal system, to be passed by unnoticed or to be rejected as unsound. I regard it as a part of the law. Thus, if title deeds be deposited as a security for money, and a creditor, knowing these facts, takes a subsequent mortgage on the same property, he will be postponed to the equitable mortgage of the prior creditor, and a trust will be raised in him to the amount of such equitable encumbrance. *Birch* v. *Ellames*, 2 *Anst.* 427. So if lands are held in trust, or the owner of lands is under a contract to sell or lease them, and a subsequent purchaser has notice of such facts, he will, in equity, stand in the place of his grantor and be chargeable with the same duties and contracts. " In such cases," says Judge Story, " he will not be permitted to protect himself against such claims, but his own title will be postponed and made subservient to theirs. It would be gross injustice to allow him to defeat the just rights of others by his own iniquitous bargain. He becomes, by such conduct, *particeps criminis* with the fraudulent grantor." 1 *Story's Eq. Jur.*, § 395. It will be observed that it is a feature common to all these instances, that the party in fault acquires the legal title in an unrestricted form, but in disregard of the known equitable rights of others, and that these same elements exist in the case now before this court. But there is also another clearly defined line of cases illustrative of the same rule. I mean that class of decisions which hold that an

agreement between the owners of several parcels of lands, that the buildings to be erected thereon shall not be applied to certain specified uses, is obligatory. Such stipulations have been repeatedly held to be obligatory, not only upon such owners, but upon their alienees taking with notice. *Whatman* v. *Gibson*, 9 *Sim.* 196, was of this description. In that case the owner of a piece of ground, which was laid out in building lots, having sold some of them, he and the purchasers executed a deed, whereby it was agreed that it should be a condition of the sale of all the lots, that the several proprietors should observe all the stipulations of the deed, among which was one prohibiting the use of any building as a tavern. This restriction was declared to be binding, in equity, on a purchaser with notice, although he had not executed the deed, but claimed derivatively through a purchaser who had. This decision, Sir Edward Sugden observes, is fully warranted by the older cases. *Ven. & Pur.*, 2 *Vol.*, *p.* 185. And the same principle will be found exemplified in the following series of adjudications, which extend down almost to the present moment: *Tulk* v. *Moxhay*, 2 *Phill.* 774; *Coles* v. *Sims*, 5 *De Gex, M. & G.* 1; *Mann* v. *Stephens*, 15 *Sim.* 376; *Western* v. *MacDermot*, *Law Rep.* 1 *Eq.* 499; *S. C., Law Rep.* 2 *Ch. App.* 72; *Bristow* v. *Wood*, 1 *Coll.* 480; *Brouwer* v. *Jones*, 23 *Barb.* 153; *Coleman* v. *Coleman*, 7 *Harris* 100.

It will be found upon examination, that these decisions proceed upon the principle of preventing a party having knowledge of the just rights of another, from defeating such rights, and not upon the idea that the engagements enforced create easements or are of a nature to run with the land. In some of the instances the language of the court is very clear on this point. Thus in *Wilson* v. *Hart*, *Law Rep.* 1 *Ch. App.* 463, which was a suit to compel the observance of a covenant not to use any building erected on a building plot as a beer shop, the defendant, who was the assignee of the covenantor, was enjoined, although Sir G. J. Turner, L. J., in delivering the judgment, declared that, in his opinion, the

covenant did not run with the land; that it did not purport to bind assigns; and that it seemed to be a covenant directed not against the use of the land, but against the personal use and enjoyment of the building to be erected upon the land.

Nor is this doctrine without illustration in our own courts. It was enforced in the case of *Van Doren* v. *Robinson* 1 *C. E. Green* 256. This was a suit founded on a covenant in a conveyance, whereby the grantee agreed to re-convey to the grantor whenever he, the grantee, should quit the actual possession of the premises. The grantee conveyed to a stranger, who took the title with constructive notice of the covenant. Chancellor Green maintained that this was a mere personal covenant; that it neither ran with the lands nor bound the alienee at law, but that it would be enforced against such alienee in equity, when he was chargeable with notice of the original contract. And in *Holsman* v. *Boiling Spring Bleach. Co.*, 1 *McCarter* 347, the same accurate jurist maintained the right of equity to exert its authority, in proper cases, to prevent injustice without any dependency on the merely legal rights of the parties. And I think it is also manifest from the case of *Rogers* v. *Danforth*, 1 *Stockt.* 294, that Chancellor Williamson was of the same mind on this subject, for he remarked, with reference to a covenant touching lands, that he does not think that it follows that because a suit at law cannot be maintained, a Court of Chancery may not protect the rights of the parties under it.

From this review of the authorities, I am entirely satisfied that a court of equity will sometimes impose the burthen of a covenant relating to lands on the alienee of such lands, on a principle altogether aside from the existence of an easement or the capacity of such covenant to adhere to the title. So far I think the law is not in doubt, and the only question in this case, which I have regarded as possessed of any material difficulty, is whether the covenant now in controversy is embraced within the proper limits of this branch of equitable jurisdiction. The inquiry is, have courts of equity ever gone the length of enforcing contracts similar to the one now

before us? My conclusion is, that this question should be answered in the negative, and for the reasons following, viz. First, because the enforcement of this covenant between the parties to this suit would establish a principle which must inevitably overturn, by the application of equitable principles, the entire doctrine which prevails in courts of law, that covenants, as a general thing, will not run as a burthen upon land. That this would be the result, I think will become at once apparent to any person who will carefully compare the present covenant with those which have been decided to be incapable of enforcement as not running with the title. It has been remarked, and I think upon solid grounds, that with regard to mere legal remedies, there appears to be no authority for saying that the burthen of a covenant will run with land in any case except that of landlord and tenant, *Notes to Spencer's Case,* 1 *Smith's L. C.* 138. This is the admitted rule at law; but if this complainant is to be relieved, then in equity we have the opposite rule, that all covenants touching land, which are known to the purchaser at the time of the transfer to him, become attached to the land, and will descend with the title, under similar conditions, to the remotest alienee. The extent of such a doctrine is this: that the owner of land may impress upon it any of his notions, and equity will see that the land shall retain such impress in the hands of every subsequent holder. Let us test the principle by example. A is the owner of land, and he covenants with B that neither he, A, nor his assigns, will ever raise any grain on such land, or will ever permit a dwelling-house to be put thereon. It is clear that, at law, such covenants as these will not become parcel of the land so as to fetter it in its devolutions. The remedy for their breach, if intrinsically legal, is by suit against the original covenantor. But if an agreement that marl shall not be sold from a certain tract of land will pass as a burthen upon such land in equity, it will be difficult to hold that in the examples just put the same result is not to obtain. Thus incidents can be annexed to land, as multiform and as innu-

2 z *

merable as human caprice. The inconvenience of giving such a latitude to the power of the owner of lands, is forcibly put by Lord Brougham in the case of *Keppell* v. *Bailey*, 2 *Mylne & K.* 517. "Every close, every messuage," such is his language, "might thus be held in a different fashion, and it would be hardly possible to know what rights the acquisition of any parcel conferred, or what obligations it imposed. The right of way or of common is of a public as well as of a simple nature, and no one who sees the premises can be ignorant of what all the vicinage knows. But if one man may bind his messuage and land to take lime from a particular kiln, another may bind his to take coals from a certain pit, while a third may load his with obligations to employ one blacksmith's forge, or the members of one corporate body, in various operations on the premises, besides many other restraints, as infinite in variety as the imagination can conceive." These are the evils which I think will unavoidably result from adopting any principle which will sustain the bill in this case. If we enforce the covenant now under consideration, I do not know on what theory we could refuse to execute any covenant which has for its purpose any conceivable restriction placed upon the free enjoyment of lands. I cannot think it proper to go this length. No case has as yet been so extreme as this; and I can perceive no good reason, but much inconvenience, in enlarging the sphere of this rule in equity. In my judgment, the decisions in this branch should be followed, but not transcended. If this, then, were the only objection to the case of the complainant, I should be opposed to granting him the relief for which he asks.

But, in the second place, it seems to me that this covenant, on which this suit rests, is illegal in itself, and absolutely void. The substance of this covenant is, that neither the former owner of these premises, nor his assigns, shall sell by the quantity any marl taken from these lands. This is not a restriction on the use of the land, for the marl can be dug up and used upon the land; but the restriction is on the sale of the marl after it shall have been dug up. Marl of course is an article of merchandise, and the covenant restrains traffic

in that article. It prohibits the sale of it at any time, in any market, either by the owner of the lands or by his assigns. Now it seems to me that this is a plain contract "against trade and traffic, and bargaining and contracting between man and man." That it is the rule that all general restraints of trade are illegal, has never been doubted since the famous opinion of Lord Macclesfield, in *Mitchel* v. *Reynolds*, reported in 1 *P. Wms.* 181. And the development of this rule, and its application under a variety of conditions, can be traced in the series of decisions which have been carefully collected and intelligently commented on in the notes to the case just cited in 1 *Smith's L. C.* 182. The reason upon which this rule is founded, is thus expressed by Mr. Justice Best, in *Homer* v. *Ashford*, 3 *Bing.* 326 : "The law will not permit any one to restrain a person from doing what his own interest and the public welfare require that he should do. Any deed, therefore, by which a person binds himself not to employ his talents, his industry, or his capital, in any useful undertaking in the kingdom, would be void." And so far has this principle been carried, that even in cases in which the restraint sought to be imposed is only partial, it has been repeatedly held that such agreement will be void, unless it be reasonable, and that no such agreement can be reasonable in which the restraint imposed on the one party is larger than is necessary for the protection of the other. *Horner* v. *Graves*, 7 *Bing.* 743. Tested by these principles, the covenant in question appears to be destitute of all the essentials of a legal agreement. The restraint it imposes is general, both as to time, place, and persons. It transcends, by far, the limits of utility to the covenantee. I cannot say that this covenant is legal, any more than I can say that a covenant on the part of a farmer not to sell, nor permit any of the future owners of his farm to sell, any grain to be grown on his farm, would be legal. I think all such engagements are nugatory as opposed to the valuable rule of law just referred to, and which is designed, and is so well adapted, to promote commerce by preventing the imposition of all unnecessary

trammels, either on labor or on property. In this view, I am prepared to say that the complainant's case has no legal foundation.

In conclusion, I may say that I have not overlooked the claim of the appellant to restrict the use of the lands of the respondent by force of the covenant contained in the bond and mortgage of the date of the 23d January, 1842. This covenant would be quite as objectionable as the one already considered, with regard to imposing incidents on real property so as to pass with the same from hand to hand. It is liable therefore to the first objection above stated by me, and which I think decisive of this controversy. Nor, in my opinion, can it be said to be beyond the scope of the second objection. It is to the effect that the marl from the lands of the covenantor shall not be sold so as to be brought into competition with the marl of the covenantee. It is obvious that under so broad a covenant as this, the covenantee could drive the covenantor from every accessible market in the country. I do not find any case which sanctions so broad a restriction. But it is not necessary to pursue this inquiry, for as this case is now presented the complainant is not in a position to ask the aid of this court with regard to this covenant embodied in the bond and mortgage. It will be observed that this agreement prohibits the selling of marl taken from the lands adjoining the seven acre tract, so as to bring such marl in competition with that to be derived from such tract. The appellant is now the owner of but a small part of this seven acre tract, and from which portion he has never taken any marl. If it be true then that the respondent has taken or intends to take marl from his property which adjoins the seven acre tract, such acts cannot be even technical breaches of the covenant now in question, for as the appellant has not worked that portion of the seven acre tract which still remains to him, it is obvious that the prohibited competition has not occurred. In this respect, the appellant has not suffered, nor is he threatened with substantial loss, and, consequently, on this head has no standing in a court of equity.

On these grounds, I think the decree of the Chancellor should be affirmed, with costs.

The decree was affirmed by the following vote:

*For reversal*—CLEMENT, KENNEDY, OGDEN, OLDEN. 4.