By this bill the complainants ask that the defendants be restrained from the violation of certain covenants and restrictions affecting the lands of the parties. The particular restriction which the complainants in their bill of complaint allege the defendants to have violated reads as follows:
"That there shall be but one dwelling house erected upon each lot and that the same shall not be placed within thirty-five feet from the curb line on the front of the lot, and that said dwelling house shall cost not less than Three Thousand Dollars, nor shall there be any *Page 194 
public garage nor stores of any kind or description for the sale of merchandise of any kind whatsoever erected or maintained upon said premises."
It is alleged in the bill that the defendants "are now constructing upon the premises acquired by them as aforesaid, a building to be used for a restaurant purpose, and intend to erect additional buildings on the same premises which are also to be used for business purposes." It is further alleged that the erection of this building is in violation of the express covenant which prohibits the erection of stores of any kind or description for the sale of merchandise of any kind whatsoever. It is also alleged in the bill that the covenants and restrictions referred to were imposed pursuant to a community scheme of development of the tract of land of which the lots owned by the complainants and the defendants formed a part.
The bill of complaint was filed April 18th, 1947. By a supplemental bill of complaint, filed on June 20th, 1947, the complainants allege that since the filing of the original bill of complaint the defendants have completed the erection of the building complained of and on the 30th day of May, 1947, commenced "the operation of a restaurant in said building which includes in addition to the sale of meals, refreshments, cigars and cigarettes," c. To this bill of complaint the defendants interpose four defenses:
First. They deny that the restrictions affecting the complainants' and defendants' lots are alike or that there is any uniformity in the restrictions imposed upon the various lots in the tract of which the lots owned by the parties hereto form a part, or that said restrictions were imposed pursuant to any community scheme or plan of development.
Second. They allege that the first floor of the building erected by the defendants is designed for use as a restaurant and the second floor as living quarters and does not violate the restrictions imposed upon defendants' lots.
Third. That since the imposition of the said restrictions the neighborhood has entirely changed and that properties of both complainants and defendants, and adjacent properties, have all now been devoted to business purposes and that the so-called restrictions have been widely violated for many years. *Page 195 
 Fourth. That the complainants are in laches.
The facts established by the evidence submitted at the final hearing, and as I find them, are as follows:
In 1919 the estate of William Curtis, deceased, owned a tract of land in the Borough of Point Pleasant Beach, about 374 feet in width on the ocean front and 388 feet at the westerly boundary line and extending from the Atlantic Ocean westwardly to St. Louis Avenue a distance of about 3,157 feet on the southerly line and 3,186 feet on the northerly line. This property was entirely undeveloped and consisted of an open field and some marsh or swamp land. In that year J. Edwin Ellor and Sons, a corporation, entered into an agreement with the executors of this estate for the purchase of said lands and thereupon made plans for its development. They had the property surveyed and plotted in lots and blocks, with a street known as Point Pleasant Parkway running through the center of the tract from St. Louis Avenue to Ocean Avenue, a distance of four long blocks. These blocks were subdivided into lots, most of which were approximately 50 feet in width with a depth of about 142 or 143 feet. A few of the corner lots were 50.87 feet in width and the corner lots at the extreme westerly end of the tract and at the end bordering on the west side of Ocean Avenue were a few feet wider. The purchasers of this tract of land then determined upon a plan of development by which it was designed to convert the land so purchased into a modern residential section and with this end in view the property was cleared, the swamp land and marsh land filled in, and a street bisecting the tract was laid out as a parkway, with ornamental islands in the center thereof for its entire length, between St. Louis Avenue on the west and Ocean Avenue on the east, and planned to erect for themselves on the lands lying between the easterly line of Ocean Avenue and the Boardwalk, an amusement pavilion. The sale of lots was then begun, and prior to the consummation of the purchase the developers sold three lots, deeds for which were executed by the executors of the Curtis estate, conveying them directly to the purchasers thereof. Each of these deeds contained the following restrictive covenant: "No part of any building is to be erected nearer the *Page 196 
curb line than 35 feet from Point Pleasant Parkway, and one house only to be erected on a 50 foot lot and to cost not less than $3,000.00."
The remaining portion of the tract was conveyed by the executors of the Curtis estate to J. Edwin Ellor Sons, the purchasers, by deed dated January 1st, 1920, and recorded January 27th, 1920, in the Ocean County clerk's office, and that deed contained the same restrictive covenant which was contained in the three deeds last just mentioned. Shortly after J. Edwin Ellor Sons acquired title to this tract, five other deeds for five separate lots were conveyed by J. Edwin Ellor Sons to individual purchasers thereof, subject to the same restrictions. Thereafter, there seems to have been a change in the plan of development and of the community scheme, and the restrictive covenants were somewhat broadened.
The complainants are the owners of Lot No. 29 in Block 100, as shown on the above-mentioned map or plan, which was originally conveyed by J. Edwin Ellor Sons to Mary A. Causbrook, by deed dated July 20th, 1923, and duly recorded in the Ocean County clerk's office. That deed contained the following restriction:
"That there shall be but one dwelling house erected upon the said lot and that the same shall not be placed within thirty-five feet from the curb line on the front of the lot, and that said dwelling house shall cost not less than THREE THOUSAND DOLLARS, nor shall there be any public garage nor stores of any kind or description for the sale of merchandise of any kind whatsoever erected or maintained upon said premises."
By deed dated September 10th, 1943, and duly recorded in the Ocean County clerk's office Mary A. Causbrook conveyed said lot No. 29 to the complainants, subject to the same conditions and restrictions.
The defendants are the owners of Lots 30 and 31 in Block 100, as shown on said map or plan. These lots were conveyed by J. Edwin Ellor Sons to Fred L. Sharpe and Mary Elizabeth Sharpe, his wife, by deed dated September 29th, 1923, and duly recorded in the Ocean County clerk's office. That deed contained the following restrictive covenant: *Page 197 
"No part of any building to be nearer than thirty-five feet to the curb line of Point Pleasant Parkway, one house only on a fifty-foot lot and to cost not less than Three Thousand Dollars — and no stores or public garages to be built thereon."
Lots 30 and 31 in Block 100 were conveyed to the defendants by deed dated July 10th, 1946, and duly recorded in the Ocean County clerk's office subject to "operative restrictions of record," without reciting them.
The entire tract of land has long since been disposed of by J. Edwin Ellor Sons, the developers, by the conveyance of individual lots to purchasers thereof, except for that portion of the property lying between the easterly line of Ocean Avenue and the Atlantic Ocean, all of which was sold and conveyed to Augustus C. Hayes, by deed dated March 10th, 1945, and duly recorded in the Ocean County clerk's office. Of this conveyance and the restrictions therein contained, more hereafter.
The portion of this tract of land lying between Ocean Avenue on the east and St. Louis Avenue on the west was subdivided into 91 lots. Each and every deed for lots in this tract contained restrictive covenants. The covenant contained in the first eight deeds, three of which were executed by the executors of the Curtis estate, J. Edwin Ellor Sons' grantor, as already stated, and the other five executed by Ellor Sons, contained the short restrictive covenant above quoted. The grantees of all of these lots had actual notice from the grantors of the community scheme, knew that the lots were comprised in a residential development and have religiously observed the residential scheme. That they are bound by the covenant, see Scull v. Eilenberg, 94 N.J. Eq. 759; Shoyer v. Mermelstein, 93 N.J. Eq. 57; Brewer v.Marshall and Cheeseman, 19 N.J. Eq. 537; DeRossett v. Bianchi,100 N.J. Eq. 439; Humphreys v. Ibach, 110 N.J. Eq. 647.
Thereafter every deed for lots west of Ocean Avenue, with the exception of two, contained a restriction against the erection of public garages or stores on the lots thereby conveyed, although the language of these restrictive covenants varied somewhat in many of the deeds. However, the scheme or plan to preserve this tract as a residential development is apparent *Page 198 
in all of them. And it is not necessary that the restrictions in all deeds be in identical language. If a uniform purpose is apparent, that is all that is required to bind all who had notice thereof. Humphreys v. Ibach, supra; Palmer v. CircleAmusement Co., 130 N.J. Eq. 356; McComb v. Hanly, 128 N.J. Eq. 316
(reversed on other grounds, 132 N.J. Eq. 182); Friedman
v. Cicoria, 140 N.J. Eq. 404. There are, I believe, nine variations of the language used in the various restrictive covenants. The two deeds referred to as an exception in this last statement were for lot 5 and one-half of lot 6, and for lot 7 and one-half of lot 6 in Block 103, and contained restrictive covenants, one of which forbids business of any kind, which read as follows:
 "RESTRICTIONS B
"Subject, Nevertheless, to the following covenants, conditions and restrictions: —
"That no buildings for any business shall be erected on any avenue or street as laid out on said plan, except on the land fronting on the Boardwalk.
"That only one house and a private garage shall occupy this property, and shall be Thirty-five feet from curb.
"That no building shall be erected on any part of the land hereby conveyed to be used for a public garage.
"That no dwelling house shall be erected on said land hereby conveyed which shall cost less than Three Thousand ($3,000.00) Dollars.
"That any buildings erected upon the land hereby conveyed shall be set to the grade established by the municipal authorities of the municipality in which it is located.
"Also Subject to any other restrictions now of record appertaining to said land not in conflict herewith or incorporated herein."
The restrictive covenants imposed by the several deeds other than the two last mentioned, and as contained in the first eight deeds, three of which were executed by the Curtis estate and five by J. Edwin Ellor Sons, marking the first sales out of this tract, in the nine variant forms referred to, as indicated on the map (Exhibit C-1), are as follows:
 "RESTRICTIONS A
"Subject, Nevertheless to the following covenants, conditions and restrictions: —
"That only one house shall be erected to every Five Thousand (5000) square feet, or like area. *Page 199 
"That no building shall be erected on any part of the land hereby conveyed to be used for a public garage.
"That no dwelling house shall be erected on said land hereby conveyed which shall cost less than Three Thousand ($3,000.00) Dollars.
"That any buildings erected upon the land hereby conveyed shall be set to the grade established by the municipal authorities of the municipality in which it is located."
 "RESTRICTIONS C
"Subject, However to the following conditions and restrictions:
"That no part of any building shall be erected nearer the curb line than Thirty-five (35) feet from Point Pleasant Parkway;
"That only one house shall be erected on a fifty-foot lot;
"That no dwelling house shall be erected on said lot hereby conveyed which shall cost less than $3,000.00;
"That no stores or public garages are to be erected on said lot.
"Also subject to any other restrictions now of record appertaining to said land, not conflicting herewith or incorporated herein."
 "RESTRICTIONS D
"Subject nevertheless to the covenants, conditions, and restrictions that the said party of the second part, her heirs, executors, administrators and assigns shall not and will not erect or cause to be erected upon the said premises any dwelling house costing less than THREE THOUSAND DOLLARS; that she nor they shall not erect or permit to be erected upon the said premises any building nearer the line of Point Pleasant Parkway than Thirty-five feet, and that she and they shall not erect or permit the erection of any store or public garage upon the said premises, nor permit the same to be used for such purposes."
 "RESTRICTIONS E
"Subject to the following covenants and restrictions: —
"That not more than One House shall be erected upon said lot and to cost not less than Three Thousand ($3,000.00) Dollars, and to be set back not less than Thirty-five feet from the curb line as now established.
"There shall not be erected thereon any Public Stable or Public Garage, nor any building for the conduct of any Public Business."
 "RESTRICTIONS F
"The said party of the second part hereto, for herself, her heirs and assigns doth covenant and agree to and with the said party of the first part, its successors and assigns, that the said premises are sold and conveyed subject to the following conditions and restrictions, which shall run with the land, viz: — That there shall be but one dwelling house erected upon the said lot and that the same shall not be placed within thirty-five feet from the curb line on the front of the lot, and that said dwelling house shall cost not less than THREE THOUSAND DOLLARS, nor shall there be any public garage nor stores of any kind or description for the sale of merchandise of any kind whatsoever erected or maintained upon said premises." *Page 200 
 "RESTRICTIONS H
"Under and Subject Nevertheless, to the following conditions and restrictions; No part of any building is to be erected nearer to the curb line than 35 feet from Point Pleasant Parkway; 1 house only to be erected on a 50 foot lot, and to cost not less than $3,000.00; and no stores or public garages are to be erected on said lot. Also subject to other restrictions of record."
 "RESTRICTIONS I-(1)
"Subject nevertheless to the following restrictions; no part of any building is to be erected nearer than the curb line than 35 feet on said Point Pleasant Parkway, one house only to cost not less than $3000.00 and no store or public garage buildings are to be erected on the above described premises."
 "RESTRICTIONS I-(2)
"Subject to the following restrictions. No part of any building to be nearer the curb line than 35 feet on Point Pleasant Parkway. One house only to be erected on a 50 foot lot and to cost not less than $3000. No public garages or stores to be erected on this property."
 "RESTRICTIONS I-(3)
"The following restrictions are placed upon the transfer at least 35 feet between building and street, no public garage or store built or operated One house erected to be in worth at least $3000 and one dwelling on 50 foot lot."
From a comparison of these nine variants, it will be seen that the general scheme of a residential development was strictly adhered to, and while the covenants were not in uniform language, their purpose was completely uniform. They were, without doubt, expressly designed to prevent the erection of any building on any of the lots in this tract west of Ocean Avenue for other than residential purposes.
The evidence disclosed that Form "A" of the restrictive covenants above quoted was contained only in the deed to Augustus C. Hayes for the land lying east of Ocean Avenue; Form "C" for one lot, No. 9 in Block 103; Form "D" for two lots, Nos. 2 and 5 in Block 104; Form "E" for three lots, No. 19 in Block 106, No. 13 in Block 107, and No. 15 in Block 101; Form "F" for five lots, Nos. 23, 25, 26 and 29 in Block 100, and lot No. 4 in Block 102; Form "H" for 23 lots, Nos. 19, 20, 21, 22, 24 and 28 in Block 100, Nos. 5, 7, 8, 9 and 16 in Block 101, Nos. 1 and 2 in Block 102, Nos. 3, 4 and 8 in Block 103, Nos. 11, 12, 14, 15 and 16 *Page 201 
in Block 107, Nos. 1 and 3 in Block 104; Form "I-(1)" for 12 lots, Nos. 17 and 18 in Block 100, Nos. 13 and 14 in Block 101, No. 6 in Block 102, Nos. 2 and 10 in Block 103, No. 4 in Block 104, No. 17 in Block 106, Nos. 19 and 20 in Block 107 and No. 19 in Block 108; Form "I-(2)" for 24 lots, Nos. 27, 30 and 31 in Block 100, Nos. 1, 2, 3, 4, 6, 10, 11 and 12 in Block 101, Nos. 3, 5, 7, 8 and 9 in Block 102, No. 10 in Block 104, No. 11 in Block 106, Nos. 12, 13, 14, 17, 18 and 20 in Block 108; Form "I-(3)" for one lot, No. 15 in Block 108.
And it is a fact that while residences have been built on at least 50 per cent. of the lots comprised in the portion of this tract lying to the westward of Ocean Avenue, not a single business structure was erected on any of the lots until that erected by the defendants and which is the subject of this complaint, except, however, that the same defendant in 1946 erected a small "hot-dog" stand on his corner lot. But more of this hereafter.
From the foregoing, I think it plainly appears that the first defense of this bill of complaint cannot prevail. That there was a community scheme designed to restrict all of the lots in this tract of land lying west of Ocean Avenue, to residential purposes, admits of no doubt.
Passing, for a moment, the second defense, I shall discuss the third defense — that since the imposition of the restrictions mentioned, the neighborhood has entirely changed, so that both sides of Ocean Avenue have come to be devoted to business purposes and the restrictions have been widely violated for years.
The Borough of Point Pleasant Beach, and especially that portion of it lying between the railroad, which runs through the town, and the Atlantic Ocean, is a summer resort and there is no doubt but that on the beachfront and along Ocean Avenue there have been many changes in the character of the property along Ocean Avenue in the last ten years. Both sides of Ocean Avenue, to the north of the Ellor tract and to the south thereof, contain many buildings devoted to business purposes and also many residences are erected on both sides of that avenue, both north and south of the Ellor tract. *Page 202 
To the north, one of complainants' witnesses, an experienced real estate man, who has an office on Ocean Avenue, said that between the Ellor tract and Broadway (which is the street running from State Highway Route 37 along the south side of Manasquan River to Ocean Avenue) there were over 100 bungalows, and the east side of Ocean Avenue is, without doubt, the business side of the street. However, no business of any kind was ever conducted on any part of the Ellor tract lying to the west of Ocean Avenue until the operations of the defendants began. On the north side of Point Pleasant Parkway, at the northwest corner of the Parkway and Ocean Avenue, there are two dwelling houses, one facing Ocean Avenue and the other facing the Parkway. The southwest corner of Ocean Avenue and the Parkway had been vacant until the building complained of was erected by the defendants. On the complainants' lot there is erected a dwelling house, the lower part of which is a two-car garage and the upper part of which is the living quarters in which the complainants reside during the summer season. The defendants claim that the complainants are themselves violating the restrictive covenants in their deed by reason of the fact that they rent a portion of this two-car garage. What they have done, is to permit one of their neighbors to put his car in this garage and they charge him for the privilege. This in no sense, in my judgment, converts this private garage into a public garage nor does the renting of a portion thereof to a neighbor constitute a violation of the restrictive covenant contained in complainant's deed.
The only other violations of the restrictive covenants claimed by the defendants to have occurred on the west side of Ocean Avenue arise from the fact that on three of the lots, living quarters have been constructed over or in a private garage on the rear of the lot, and it is claimed that by reason thereof the restriction against one dwelling house to a 50-foot lot has been violated. The fact is that the original purchasers of these three lots erected a building for a private residence thereon and built a private garage in the rear. Subsequently living quarters were built over two of these garages and one of them was converted into a guest house to accommodate the *Page 203 
overflow of summer guests in the main residence. I do not consider that these three alleged violations of the restrictive covenants contained in the respective deeds have in any way changed the character of this neighborhood from a residential community to that of business.
I shall now discuss the portion of the Ellor tract lying between the east side of Ocean Avenue and the Boardwalk. As already stated, it was the original intention of the developers to build an amusement pavilion on this lot, but in 1925 they sold it to Augustus C. Hayes and conveyed it to him by deed dated March 10th, 1925. That deed contained a different set of restrictive covenants which are as follows:
"That only one house shall be erected to every Five Thousand (5000) square feet, or like area.
"That no building shall be erected on any part of the land hereby conveyed to be used for a public garage.
"That no dwelling house shall be erected on said land hereby conveyed which shall cost less than Three Thousand ($3,000.00) Dollars.
"That any buildings erected upon the land hereby conveyed shall be set to the grade established by the municipal authorities of the municipality in which it is located."
It will be noted that there is no prohibition against stores in these restrictive covenants, nor is there any provision for a set-back from the street line. It is true that the original deed from the Curtis estate to Ellor Sons contained a provision for a 35-foot set-back from Point Pleasant Parkway, but at the date of that deed, the Parkway did not extend eastwardly beyond Ocean Avenue. Obviously, the 35-foot setback was not intended to apply to the land east of Ocean Avenue. Prior to the conveyance to Hayes, the developers had extended the Parkway eastwardly from the east line of Ocean Avenue to the Boardwalk, and had built concrete sidewalks and curbs on both sides thereof. The land east of Ocean Avenue, however, was never subdivided into lots, either by the Ellor company or by subsequent grantees. These facts and circumstances, and the fact that Ellor Sons had originally planned an amusement park on this area, explain why a different set of restrictions were imposed in the Hayes deed. The entire tract east of Ocean Avenue which was thus conveyed *Page 204 
to Hayes was by him conveyed to the present owners who have proceeded to develop it by building on the south side of the Parkway a large amusement pavilion which contains a number of stores of various kinds, including a restaurant, a tavern licensed to sell alcoholic liquors, a swimming pool and numerous other amusements. On the north side of the Parkway at the extreme end of this lot and fronting on the east side of Ocean Avenue, there is a bakery which has been in operation for ten years or more. There are one or two small buildings on the portion of the lot on the north side of the Parkway, and in the street itself there was erected during the recent war period, a first aid station which was occupied by a local first aid unit. It is now said to be used for the storage of beach umbrellas and other like equipment, and others of the smaller buildings on the north side of the Parkway are used for like storage purposes; and another is for the use of an attendant of a parking lot which occupies the remaining portion of this lot on the north side of the Parkway, the parking lot being owned and operated by the owners of the pavilion.
At the final hearing in this cause and in the arguments of cousel for the defendants, much stress is laid upon the fact that all of the original Ellor tract lying between the east line of Ocean Avenue and the Boardwalk, is used for business purposes, and this fact is stressed as indicative of the alleged change of character of the Ellor tract from a residential development to a business community. And attention is called to the restrictive covenant contained in the deed from the executors of the Curtis estate to J. Edwin Ellor Sons, the developers, which provided for a building set-back of 35 feet from the curb line of the Parkway, one house only to each 50-foot lot to cost not less than $3,000, and it is argued that the conversion of this plot east of Ocean Avenue into a business section shows an abandonment by the developers of the original idea of developing the tract as a residential community, if such idea ever existed. To this argument I cannot accede, as Arthur Ellor, the former secretary and treasurer of J. Edwin Ellor Sons, one of the original developers of this tract, testified that from the date that they acquired *Page 205 
title to this tract it was their intention that the property east of Ocean Avenue should be developed into a sort of an amusement park. The erection of the Jenkinson Pavilion and the operation of various stores and amusements therein does not, in my judgment, in any way indicate any abandonment of the original community scheme of development.
The fourth defense, of laches, will now be considered. This defense is based upon the following facts. The defendants took possession of Lots 30 and 31 in Block 100 by agreement with their vendors, prior to the receipt of their deed of conveyance on July 10th, 1946, evidently sometime in the early part of June, and immediately began grading the lots and putting on a top-coating of gravel. The complainants inquired of one of the defendants who was in charge of the work of grading and graveling as to the purpose to which the lots were to be devoted, and were told that the defendants intended to operate an automobile parking lot thereon. In the restrictive covenants affecting these lots there is no prohibition against their use as an automobile parking lot unless it can be said that an automobile parking lot is a public garage, and this is not asserted nor it is in issue here. No opinion is hereby expressed on that question. On the east line of complainants' lot there was at that time erected a stone or concrete wall about three feet high, and as a result of conversations between the complainants and one of the defendants, a guard rail was erected to the east of this wall to prevent automobiles colliding with it. Some time afterward, and without any previous notice or intimation to the complainants, the defendants moved a small building on lot 31 near the corner of the Parkway and Ocean Avenue. This building was moved on the property at night, although it is claimed by the defendants that a foundation for it had previously been erected. The placing of this building on this lot aroused the curiosity not only of the complainants, but of other owners of lots on the Ellor tract, and a number of lot owners attended a meeting of the mayor and council of the borough one evening in June, 1946, and asked for information as to the purpose to which this building and the lots were to be devoted. It would appear that several of the lot owners *Page 206 
spoke, but they obtained no satisfaction. It so happened that one of the defendants, Nestor S. Lane, the defendant with whom the complainants had had their previous conversations, was present at this meeting and when the inquiry touching what the defendants were going to do with these lots and the building thereon was made, the mayor said that Mr. Lane was present and could tell them if he wanted to, but that he was not obliged to do so. Mr. Lane then arose and refused to make any statement respecting the purpose to which he proposed to put the building or the lots. The complainant Carrie M. Jackson says that he stated that it was none of their business what he was going to do with the lots. Mr. Lane denies this statement, but admits that he refused to give any information. Shortly thereafter this small building was converted into a roadstand for the sale of "hot dogs," soda, candy and other refreshments and a sign was painted on the building indicating the merchandise which was for sale. The stand was opened for business early in July and the business of selling "hot dogs," soda, candy, cigars, cigarettes, c., was carried on there until the middle of September of that year, when it was closed. It is claimed that the complainants acquiesced in this business during this period and that they cannot, therefore, now complain of a similar business being carried on on a larger scale. But while it may be that no direct protest was made to the defendants by the complainants, it was perfectly obvious that the complainants and other lot owners were much concerned as to the use to which the defendants' lots was to be devoted. And acquiescence, if any, in the operation of that small stand does not extend to the business now being conducted in defendants' restaurant. During that period, the complainants consulted counsel, a lawyer in Plainfield, New Jersey, who made an examination of the records in the Ocean County clerk's office and then advised complainants of what he considered to be their rights. On September 25th, 1946, at the instance of the complainants, this lawyer wrote to the defendant Nestor S. Lane, calling his attention to the restrictive covenants contained in the defendants' deed, mentioned the operation of the "hot-dog" stand during the summer and his clients' concern therewith, *Page 207 
and on behalf of his clients he objected to any violation of the restrictions by the conduct of any business by the defendants on these lots. No attention was paid to this letter by the defendant, and in November the lawyer wrote another letter to Mr. Lane, advising him that it was his intention to apply to the Court of Chancery for an injunction to restrain the operation of any business on the defendants' lots, or the erection of any stores or public garages or any other building violative of the restrictive covenants thereon. This letter Mr. Lane took to his lawyer in Point Pleasant (not his present counsel), who wrote to the complainants' lawyer advising him that in his opinion the restrictive covenants were no longer operative, that the conditions had so changed in the vicinity of those lots that there could now be no objection to the defendants erecting thereon whatever they pleased, and devoting it to any business that they chose. He stated that it was the intention of the defendants to put several buildings on the lots, one of which would be a restaurant.
The bill in this cause, as already stated, was filed on April 18th, 1947. The fact that it was not sooner filed is claimed to sustain the defense of laches here pleaded, but, in my judgment, the complainants acted with reasonable promptitude under the circumstances. They reside permanently in Plainfield, New Jersey, and they occupy their property in Point Pleasant only during the summer season. They returned to Plainfield in early October of 1946 and did not again come to Point Pleasant until the latter part of March or the 1st of April, in 1947. They then noticed building materials on the defendants' lots and endeavored to obtain information from the local authorities as to what sort of a building was to be erected thereon, but they were refused the information which they sought. Thereupon they again consulted their lawyer in Plainfield and instructed him to proceed immediately to obtain an injunction to prevent the violation of the restrictive covenants by the defendants. The Plainfield lawyer contacted the solicitor who filed this bill of complaint. It is claimed on behalf of the defendants that they had no notice of the complainants' objection to the erection of the building which now occupies the defendants' lots *Page 208 
until the service of the subpoena in this cause on April 21st, 1947, and that they were, therefore, within their rights in proceeding with the erection of their building; and they claim that they have now invested between $20,000 and $30,000 in the building and that it would be inequitable to prevent them from using it for the purposes for which it was designed. I think it is obvious that an injunction against the further use of this building as a restaurant would impose a considerable hardship on the defendants, but that hardship is one of their own choosing as it is equally obvious that the defendants knew of these restrictions before they purchased the property; that they bought it with the intention of violating the restrictions or of disregarding them, relying on their belief and the advice of counsel that the restrictions were no longer operative; and that they persisted in this intention from the very start of their operations, notwithstanding ample knowledge on their part that the complainants and other lot owners in the vicinity objected to the erection of any store or other building on these lots which would be violative of the restrictive covenants. It is ridiculous for them to assert that they had no notice of the complainants' objections, and after complainants' experience before the mayor and council of the Borough of Point Pleasant, when information as to the use to which these lots was to be devoted was refused by the defendant Nestor Lane, it could hardly be expected that they would inquire directly of him as to the defendants' intention. They took the only course open to them and that was to employ counsel and make their objections and inquiries by letter, through their counsel. But the protests of their counsel were ignored and there is not the slightest doubt in my mind but that the defendants felt that they could ignore these restrictive covenants with impunity. Whatever they did after June, 1946, was with full knowledge of the restrictive covenants and the complainants' insistence for their observance. Thereafter, the defendants acted at their peril.
I shall now consider the second defense interposed in this bill, and that is that the two-story building erected by the defendants and the restaurant operated on the first floor thereof does not violate the restrictive covenants because a *Page 209 
restaurant is not a store, and it seems to me that my decision in this cause must turn upon this point. If a restaurant where food is sold and, incidentally, cigars and cigarettes are also sold, is a store within the meaning of the restrictive covenant, then the complainants are entitled to an injunction. If it is not, then the bill should be dismissed.
There is a paucity of judicial opinion touching the point in question, but in approaching its discussion it must be borne in mind that restrictions of this kind are strictly construed (Walker v. Renner, 60 N.J. Eq. 493), and all doubts are resolved against the party seeking to enforce them (Fortesque
v. Carroll, 76 N.J. Eq. 583; Meaney v. Stork, 80 N.J. Eq. 60;
affirmed, 81 N.J. Eq. 210). When the right to relief is doubtful, or the meaning of the restriction is vague or uncertain, an injunction will not issue to enforce it. Meaney
v. Stork, supra; Howland v. Andrus, 81 N.J. Eq. 175.
The word "store" is defined in Webster's New InternationalDictionary (2d ed.) p. 2486, as follows:
"A place of deposit for goods, esp. for large quantities; a storehouse; warehouse; magazine; * * * Any place where goods are kept for sale, whether by wholesale or retail; a shop."
The word "restaurant" is defined in Webster's NewInternational Dictionary (2d ed.) p. 2124, as follows:
"An establishment where refreshments or meals may be procured by the public; a public eating house."
In 60 C.J. (at p. 116), the text is as follows:
"STORE. * * * As Noun. * * * A broad word, employed in many senses, and variously defined.
And, at p. 117:
"In Sense of Place — a. Of Sale.
"The noun has a popular, settled, known, and well defined legal signification, well understood by every person, as meaning a building, or room, in which goods of any kind, or goods, wares, and merchandise, are kept for sale; a business establishment where personalty is kept and sold, and incidently gotten in salable condition; a house used *Page 210 
for the sale of goods, wares, and merchandise, or where goods are bought and sold; any building used for the sale of goods of any kind; * * *."
And, at p. 118:
"In different connections the word has been held to embrace a wide variety of establishments, including a bakery and restaurant, * * *."
And, see 7 Words and Phrases (1st ser.) 6672 et seq., for a collection of cases in which the meaning of the word "store" is discussed.
In Continental Paper Bag Co. v. Bosworth (Tex.),276 S.W. Rep. 170, it was held that in American usage, the word "store" when employed to designate a place of business, is a broad one, and in Richards v. Washington Fire and MarineInsurance Co., 60 Mich. 420, 425; 27 N.W. Rep. 586, it was held that a bakery and restaurant was properly described as a "store" without misrepresentation in an application for insurance, andContinental Paper Bag Co. v. Bosworth, supra, and Kelly v.Theo. Hamm Brewing Co., 140 Minn. 371; 168 N.W. Rep. 131, are cited as authority for that holding.
I have examined the reports of the cases above cited, and of many others cited or referred to in Corp. Jur. and in Wordsand Phrases, but I have found only one case which is exactly in point, and that is a decision of the Canadian High Court of Justice and to which I shall later refer.
Continental Paper Bag Co. v. Bosworth, supra, was a suit for injury occasioned by printing machinery, where the insurance policy covered "store and warehouse." It was held that the insured was covered. The court (Short, J.) said:
"In American usage, the word `store,' when employed to designate a place of business, is a broad one. It signifies not merely a warehouse, storehouse, or storeroom, but may include in its meaning a business establishment where personalty is kept and sold, and incidently gotten in salable condition."
However, in Debenham v. Short (Tex.),199 S.W. Rep. 1147, 1148, in construing a statute providing for a lien for employees performing service in any "store," "hotel," or *Page 211 
"shop," c., the court held that this did not authorize a lien upon a restaurant. The court (Willson, C.J.) said:
"For a like reason, to wit, that a `restaurant,' notwithstanding cigars are sold in it, as they were in the Elite Cafe, is not a `store' or a `shop' within the popular meaning of these words, we think the contention made by the appellant to the contrary must be overruled. So far as the record shows to the contrary, selling cigars was a mere incident of the business to which the Cafe was devoted, and we think, did not make it a `store.'"
In Davidson v. Chinese Republic Restaurant Co., 201 Mich. 389; 167 N.W. Rep. 967, the question was whether the proprietor of a restaurant was responsible for the consequences of the act of a head-waiter who struck a patron. At page 395 (201 Mich.) and page 969 (167 N.W. Rep.), respectively, Ostrander, C.J., said:
"It is unnecessary to state here the relation of the proprietor of an inn to his guests, because a restaurant is not an inn. One eats, perhaps drinks, in a restaurant, pays for what is served, and goes away. The business resembles more nearly that of a storekeeper who sells wares to the public, which is invited to come and inspect and buy or decline to buy what is offered for sale."
Richards v. Washington Fire and Marine Insurance Co.,supra, was a suit on an insurance policy. One of the defenses was that the use of the premises was stated to be for "stores and residences" and that a restaurant and bakery (in one of the stores) was not a store. It was held that the policy covered. The court (Campbell, C.J.) said:
"The question presented cannot be regarded as whether this language is technically accurate. It can only be material if soinaccurate as to mislead to the extent of probable prejudice andinjury. The word `store' is commonly used in this country as the equivalent of the English word `shop,' which is very generally applied to what we call a `bakery,' as it is to any room or building where any kind of article or traffic is sold. The American word `store' applies to the building — the name more strictly belonging to the collection of wares within it. The English `shop' is the building itself, as distinguished *Page 212 
from a place of sale which is open, like a `stall' * * *. A `restaurant' has no more defined meaning, and is used indiscriminately for all places where refreshments can be had, from the mere eating-house or cookshop to the more common shops or stores, where the chief business is vending articles of consumption and confectionery, and the furnishing of eatables to be consumed on the premises is subordinate.
"The testimony does not indicate that a restaurant or a bakery is more dangerous than any other grocery or provision store, and the fact that the impropriety of using the phrase `store' does not appear to have occurred to either the general or local agent or to anyone else, until this suit was brought, is reason enoughagainst our attempting to declare, as a matter of law, that theword is dangerously misleading, and a misrepresentation."
(Italics mine.)
In Kelly v. Theo. Hamm Brewing Co., supra, a statute requiring every hoistway, elevator, c., in any factory, c., or store to be guarded, c., was held to apply to a building where the business carried on therein is a saloon, and that the building is a "store" within the meaning of the statute. The court (Brown, C.J.), said:
"A saloon building so equipped, with employes therein who are entitled to the protection of the statute, properly may be construed a `store' within the meaning and intent of the law. Authorities are not wanting to support that view. It has been held that the term `store' includes any building used for the sale of goods of any kind. Salomon v. Pioneer Cooperative Co.,21 Fla. 374; 58 Am. Rep. 667; Richards v. Washington Fire andInsurance Co., 60 Mich. 420; 27 N.W. Rep. 586."
In Salomon v. Pioneer Co-Operative Co., supra, it was held that the words "store" and "shop" are synonymous terms.
A careful reading of the above-mentioned cases will disclose that none of them involved the particular point here in question. In Richards v. Washington Fire and Marine Insurance Co.,supra, and in other cases also, an insurance policy was involved, and the decision turned rather upon the intent of the parties rather than upon a strict construction of the word "store." In Debenham v. Short, supra, the word "store" was given a strict construction. *Page 213 
I have found no New Jersey case directly in point, but inPolhemus v. De Lisle, 98 N.J. Eq. 256, I held that the business of a public restaurant and roadhouse was included in the word "trade," and that the word "restaurant" was not synonymous with the word "store." The covenant there involved was against any "trade, manufacture, saloon, store or shop whatsoever."
A case which is practically on all fours with the instant case, and to which I have already referred, is McCormick v. City ofToronto, 54 Ont. Law Rep. 603; 25 Ont. Weekly Notes 155. There, the question was, is a restaurant "a store or manufactory" within the meaning of a by-law of the City of Toronto providing that "No building shall be located, erected or used for * * * stores, manufactories, * * * within certain portions of the City of Toronto." The court (Wright, J.) said:
"The meaning of the word `store' has been considered in Cityof Toronto v. Foss (1912-1913), 27 O.L.R. 264, and in appeal at p. 612 of same report. According to the decisions in that case, a store is `a place where merchandise is kept for sale.'
"In Rex v. Wells (1911), 24 O.L.R. 77, Mr. Justice Middleton held that a restaurant-keeper was not a merchant within the meaning of the Lord's Day Act. He points out, at page 80, that, although a restaurant-keeper does purchase and sell goods, yet the services he renders to his guests are in the nature of work and labour rather than the sale of goods.
"In Dennis v. Hutchinson (1922), 1 K.B. 693, the meaning of the word `shop' as a synonym for the word store as generally used on this continent, was held to be `a place where goods are sold by retail and stored for sale.'
"A consideration of these cases leads to the conclusion that a restaurant is not a store within the terms of the by-law. In the former the service rendered is an important part of what is supplied to the guest, and the goods or meals are consumed on the premises. In the latter the goods are stored, sold, and removed from the premises in practically the same condition throughout.
"As ordinarily used, the word `store' does not include a *Page 214 
restaurant, and, in considering the meaning of a word in a by-law, the popular meaning is to be assigned to it unless there is some other meaning clearly indicated by the by-law itself."
The case of Rex v. Wells, supra, cited by Mr. Justice Wright in McCormick v. City of Toronto, supra, was decided by Middleton, J., in the Chancery Division of the Canadian High Court of Justice. At page 80 of the report Mr. Justice Middleton said:
"A merchant is one who buys and sells commodities as a business and for profit; who has a place of sale and a stock of goods; and is generally a trader in a large way. The term `trader' is generally used in connection with a specialised mercantile business. The essential thing is the same in both cases, the purchase and sale of goods as a business. The goods bought in bulk are sold in retail, but, save for breaking bulk, are passed on unchanged to the customer. Although an hotel-keeper and a restaurant-keeper do purchase goods, and do sell goods, this is not the essential thing. The services they render to their guests are in the nature of `work and labor' rather than of the `sale of goods.' * * *
"A restaurant-keeper may supply meals and refreshments. The refreshments may be either food or drink or both — and I can see no reason why he may not sell a cigar as an incident to a meal; but it is the essence of his calling that what he sells is sold for consumption on the premises."
I think it is clear that the words "store" and "restaurant" are not synonymous (Polhemus v. De Lisle, supra), and I incline to the reasoning of the Canadian cases above cited. See, also,Debenham v. Short, supra.
I think the language of Vice-Chancellor Foster in Union Inv.Co. v. Fiske, 107 Atl. Rep. 65, is pertinent here. In that case he said:
"The most that can be said in favor of complainant's contention is that the restriction is vague, indefinite, and uncertain, and complainant's right to have it enforced is at least doubtful."
As "to doubt is to deny," I must deny the relief here sought by the complainants and I hold that the word "store" as used *Page 215 
in the restrictive covenant applicable to the defendants' lots does not include or apply to the restaurant built and operated by the defendants. I will advise a decree dismissing the bill and the supplemental bill of complaint.